Robert J. NEHM and Kathleen C. Nehm, Petitioners-Respondents-Cross Appellants,†

v.

STATE of Wisconsin DEPARTMENT OF AGRICULTURE, TRADE AND CONSUMER PROTECTION, Respondent-Appellant-Cross Respondent.

Court of Appeals

*No. 96–1654. Submitted on briefs February 24, 1997.—Decided June 11, 1997.*

(Also reported in 567 N.W.2d 640.)

†Petition to review denied.

On behalf of the respondent-appellant-cross respondent, the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Bruce A. Olsen*, assistant attorney general.

On behalf of the petitioners-respondents-cross appellants, the cause was submitted on the briefs of *Steven G. Bauer* of *Bauer Legal Services* of Horicon.

Before Snyder, P.J., Brown and Nettesheim, JJ.

SNYDER, P.J. The Department of Agriculture, Trade and Consumer Protection (the Department) appeals from a circuit court order finding that it failed to fulfill its obligations to assist Robert J. and Kathleen C. Nehm in their efforts to qualify for a Department cost-sharing grant. Because of this, the circuit court reversed the Department's denial of the grant money and directed it to extend its deadline to enable the Nehms to comply with the requirements of the cost-share application. While we concur with the circuit court's determination that the Department's actions were "harsh," we conclude that the Department's rules allowed it to determine that the Nehms were ineligible for the cost-share grant after their Notice of Discharge (NOD) was terminated. We therefore must reverse.

The facts of this case are taken from extensive written stipulations which are part of the administrative record. While the entire factual record is complex, we will briefly outline pertinent facts and then focus more specifically on those aspects of the record which we conclude are dispositive.

In early 1988, the Department of Natural Resources (DNR) conducted an investigation at the Nehms' farm in Washington county, prompted by a complaint which alleged that runoff from a manure storage facility was causing an adverse environmental impact on a nearby lake. As a result of that investigation, a NOD was issued pursuant to WIS. ADM. CODE ch. NR 243. At that time, the Nehms were also apprised that they were eligible for a cost-share grant to assist them in the implementation of acceptable animal waste management practices.[1] The original deadline for satisfaction of the NOD was May 30, 1989, approximately one year after its issuance.

After receiving and considering recommendations from the Washington county land conservation department[2] as to various means of addressing the NOD, the Nehms began to explore the option of relocating their entire farm operation as a possible solution. Initially they were told, however, that grant restrictions would prevent them from utilizing Department grant money for expenses associated with moving the farm. Instead, the money would be available solely for the "proper abandonment of the existing site, and installation of structures, facilities or practices necessary to meet water quality objectives at the new site."

---

[1] A NOD is issued by the DNR. Cost-share grants, which can be utilized in various ways, give preference to farmers who are subject to a NOD. The cost-share program is administered by the Soil and Water Resource Management (SWRM) program, which is a division of the Soil and Water Resource Bureau and falls under the direction of the Department.

[2] The county land conservation office ordinarily will complete an inventory after a NOD is issued and assist the farmer in determining a course of action.

In May 1989, the DNR extended the NOD deadline to July 1, 1990. There was also some discussion between the DNR and the Washington county land conservation office about the potential for additional funding for relocation of the Nehms' farm operation if that were pursued as a solution to the NOD. In July 1989, the Nehms received a letter which confirmed that the maximum grant amount they would be eligible for was $22,636, with an additional $5000 for the costs associated with the transportation of livestock.[3] The letter noted that these funds could be used only for the construction of animal waste management practices at a new site, the proper abandonment of the existing site and the costs associated with transporting the livestock.

In April 1990, recognizing that the rules circumscribing the use of the cost-share money, as outlined above, did not fairly address the substantial expenses incurred by farmers who choose to satisfy a NOD by relocation, a variance proposal initiated by the Soil and Water Resource Management (SWRM) bureau, a division of the Department, was approved by the DNR to specifically accommodate the situation presented by the Nehms. The variance included the following:

* The money must first be used to correct any identified manure management problems at the new site.

* After the identified problems at the new site are corrected, any remaining money can be used for any purpose directly related to housing or feeding the

_____
[3] This figure was arrived at by taking the allowable percentage of the total cost of abating the discharge problem at the Washington county farm.

112

livestock and managing the manure generated by the livestock.

Shortly after this variance was approved, the DNR granted the Nehms an extension of the NOD deadline from July 1 to November 1, 1990. This was to accommodate significant problems the Nehms had encountered in selling their Washington county farm and taking possession of a farm they were purchasing in Green Lake county.

On July 11, 1990, two employees of SWRM met the Nehms at the Washington county farm and traveled with them to the Green Lake county farm. At various times during the day they were joined by a DNR representative, a Washington county land conservationist and the Green Lake county land conservationist, Jim Hebbe. During a tour of the Green Lake county farm, the parties had a general discussion regarding possible manure runoff problems on one section of the farm. There was a general discussion about having Hebbe work on an inventory and evaluation of the site and propose a plan for correcting any identified problems.

During July and August, as a follow up to the July 11 meeting, Hebbe had some discussions with Nehm about specifically identifying a potential manure management problem on a portion of the acquired farm referred to as "the heifer facility" and developing a plan for its correction. Hebbe testified that during these discussions, Nehm objected to the requirement that the cost-share money would first have to be applied to the correction of any identified manure management problems. Based on these comments, Hebbe concluded that Nehm did not want the grant money with the stated limitations, and therefore concluded that there was no reason for the Green Lake county conservation

office to do any work on the farm to identify or address the potential problem.[4]

During this same period, Nehm indicated to Hebbe that he was going to pursue federal grant money through the Agricultural Stabilization and Conservation Service (ASCS) to deal with the potential manure management problem, and thereby free up the funds from the Department for the costs associated with the housing and feeding of his livestock in the new location. In October 1990, Nehm received a letter from SWRM employee Duane Klein which reconfirmed the Nehms' eligibility to receive the cost-share grant. The letter also reiterated that the money must first be used to correct any manure management problems at the new farm site and outlined the following necessary steps: to arrange financial agreements with ASCS or the Department; to set up a preliminary design and construction schedule; and ultimately to develop a cost-share agreement. This letter also stated, "In order for [the Department] to consider the manure management problems addressed the following steps must be reached *prior to the time of your relocation and within the timeframe indicated on your Notice of Discharge.*" (Underlined emphasis in original; italicized emphasis added.)

---

[4] In a stipulation of facts, the parties agreed that "[d]uring August 1990 and September 1990 Mr. Nehm attempted to obtain both runoff control funds through the DNR Nonpoint Source Pollution Abatement Program, and NOD manure management cost-share funds through the [Department] to be applied to activities on his Green Lake County property." The agency through which cost-share funds are sought is then involved in determining possible approaches to address any problem areas.

The NOD deadline was extended to November 15. By that date the Nehms had successfully moved their farm to the Green Lake county location and had completed the clean-up and abandonment of the Washington county location. On November 28, 1990, Klein again wrote to the Nehms, outlining the steps still remaining before the cost-share application could be completed. That letter reiterated the contents of the previous letter and additionally stated that the outlined steps needed to be completed prior to January 31, 1991, in order for the Nehms to remain eligible for the cost-share money.[5]

In early January the Nehms invited the Green Lake county land conservation staff to visit the farm and view the design of the manure management system. While Hebbe noted that the work had been completed, he also maintained that he was unable to state an opinion as to the soundness of the system. Nehm told him that a design engineer was preparing a drawing to document the efficacy of the system. After this meeting, Hebbe wrote to Klein that his impression was that Nehm felt "that the proposed $22,000 of cost-share funds do not have to be spent on any manure management components and therefore he is entitled to that money simply for facilities improvement."

---

[5] In the fall of 1990, the Nehms had privately engaged the services of a professional engineer to design a manure storage system for one area of the farm. Subsequent to the completion of that project, the engineer designed and oversaw the building of a system to address manure runoff problems at the heifer facility, the area Hebbe had identified as a possible problem. The system that was designed for the heifer facility was installed in November 1990; Nehm testified that he needed the system installed before he could move his cattle.

115

In mid-January, correspondence from Klein again reiterated the January 31, 1991 deadline for submission of the requested cost-share information and stated that this deadline would not be extended. Prior to the expiration of the deadline, Klein received a letter from Nehm that he had initiated some meetings for February 1991 relating to possible ASCS funding for the manure management system installed for the heifer facility. The letter did not otherwise address the issues raised in Klein's letter. On February 15, 1991, the Nehms received a letter stating that their cost-share grant eligibility had expired due to the satisfaction of the NOD on the Washington county farm and their failure to comply with the grant requirements.

The Nehms requested an administrative hearing on this decision; the hearing examiner denied the Nehms' request for an extension of the cost-share eligibility. Circuit court review followed. The court concluded that the Department's interpretation of the administrative rules, while "perhaps technically supported by the facts," was "harsh and inappropriate" because it prevented the Nehms from receiving a grant when they had done the very things which were required of them. The court then remanded the case to the Department to allow the Nehms an appropriate amount of time to comply with the Department's requirements.

■■■■■■

We review the Department's decision, not the circuit court's. *See Cadott Educ. Ass'n v. WERC,* 197 Wis. 2d 46, 52, 540 N.W.2d 21, 23 (Ct. App. 1995). We must uphold an administrative agency's findings of fact if they are supported by relevant, credible and probative evidence, and we may not substitute our own judgment in evaluating the weight or credibility of the evidence.

*See id.* If the agency's legal conclusions are reasonable, we will sustain its decision even though an alternative view may be equally reasonable. *See Monroe v. Funeral Dirs. & Embalmers Examining Bd.,* 119 Wis. 2d 385, 389, 349 N.W.2d 746, 748 (Ct. App. 1984). Furthermore, when an agency's interpretation of its own administrative regulation is involved, " '[i]t is blackletter law that the interpretation [given by the agency] . . . is entitled to controlling weight unless inconsistent with the language of the regulation or clearly erroneous.' " *Id.* at 390–91, 349 N.W.2d at 749 (quoted source omitted).

Furthermore, our review is also limited by § 227.57, STATS., which requires that a reviewing court affirm the agency's actions "[u]nless the court finds a ground for setting aside, modifying, remanding or ordering agency action . . . under a specified provision of this section . . . ." *See* § 227.57(2). This section also prohibits a reviewing court from "substitut[ing] its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact . . . [unless] it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record." *See* § 227.57(6). We turn now to the law and administrative rules that govern this case.

Under the administrative code, the DNR is required to take the following steps when a NOD is issued:

> Upon a determination under s. NR 243.22 that the discharge of significant amounts of pollutants to waters of the state is occurring or has occurred, the

[DNR] shall provide the owner or operator of the animal feeding operation with a notice setting forth:

(a) The nature of the discharge;

(b) A list of known governmental or private services which may be available to provide technical or financial assistance;

(c) One or more suggested corrective measures for controlling the discharge; and

(d) A reasonable time period for implementing necessary corrective measures, which may not be less than 60 days nor more than 2 years from the date of the notice . . . .

WIS. ADM. CODE § NR 243.23(1). In the case of the Nehms, the issuance of the NOD on the Washington county farm began extensive discussions with the DNR as well as other state agencies that could provide financial assistance in addressing the problem. The state has made available, through the Department, grants and cost-sharing funds to eligible recipients. *See* § 92.14(4), STATS. (awarding grant money to any eligible county).

█ The cost-sharing rules require applicants to take certain steps before grant money is awarded. A written cost-share agreement requires that the party seeking the grant decide on a course of action that has the approval of the Department and submit particular information about the course of action; this information then becomes the basis for the agreement. Based on all of the information provided, the Department then determines the actual amount of grant money the

farmer is eligible for. WISCONSIN ADM. CODE § Ag 166.71 (1989)[6] specifies what is required:

(1) AGREEMENTS REQUIRED. Every land conservation committee shall enter into a written conservation agreement with every person to whom the committee provides conservation funds to implement soil and water resource management projects. . . . Each agreement shall include:

(a) The name and address of the applicant . . . .

(b) The specific best management practices to be implemented.

(c) The estimated costs of implementing the project and the percentage of cost to be paid by each governmental source under any conservation agreement.

(d) Time deadlines for implementing the project.

(e) A plan for operating and maintaining the project.

(f) A method for certifying that the soil and water resource management practices have been implemented and maintained.

. . . .

(2) ADDITIONAL RESTRICTIONS IN AGREEMENTS. The land conservation committee may include more restrictive conditions in an agreement than those

[6] WISCONSIN ADM. CODE ch. Ag 166 became effective December 1, 1989. It was renumbered WIS. ADM. CODE ch. ATCP 50, effective April 1993. Our references will be to ch. Ag 166 because that is the section that was in effect while the NOD was still in effect.

required under this section, as authorized by s. 92.07(13), Stats., or other applicable law.

Once the above information is supplied and a decision is made as to the "specific best management practice" to be implemented, a cost-share agreement can be signed which specifies the steps *which the farmer has agreed to* and which are necessary to resolve the problem. The land conservation officials can then oversee the implementation of the agreed-upon practices and assure that any work conforms with the technical guide specifications. *See* WIS. ADM. CODE § Ag 166.81(4)(a).

There is no disagreement as to the Nehms' initial eligibility for a cost-share grant. In fact, the situation presented by the Nehms' solution to the NOD was so unique that SWRM drafted a variance for the cost-share grant in order to accommodate a portion of the costs associated with the relocation which would not otherwise be covered. Nonetheless, during the period that the Nehms were engaged in moving their farming operation, and in spite of the fact that the necessary information was repeatedly requested, the Nehms failed to work with SWRM in identifying and installing acceptable and verifiable manure management practices at the heifer facility on the Green Lake county farm. Finally, after the move from the Washington county farm was accomplished and the NOD satisfied, SWRM notified the Nehms that there was a deadline by which they would need to decide whether they were going to seek cost-share funds through the state. If so, the Nehms would need to provide SWRM with certain information that was necessary in order to determine the amount of cost-share funds for which they were eligible. They were also informed that the deadline would not be extended.

■
The Department submits that the following paragraph of the administrative code permitted it to determine that the Nehms were ineligible for the cost-share money. WISCONSIN ADM. CODE § Ag 166.72 is entitled "State cost-sharing agreements due to issuance of a notice of discharge or notice of intent." Subsection (4) provides:

> CONDITIONS OF INELIGIBILITY. The department may determine that a landowner or land user identified under sub. (1) is not eligible for a cost-sharing grant if the department finds any of the following:
>
> . . . .
>
> (f) The landowner or land user's notice has expired or been terminated.

The Department maintains that because the NOD on the Washington county farm had been satisfied with the move to the Green Lake county farm and the proper abandonment of the previous site, its determination that the Nehms had until January 31, 1991, to decide whether they wanted the cost-share funds was plainly allowed under its rules and was a discretionary act within its authority.

The Department hearing examiner found that while the Nehms were eligible for grant money under WIS. ADM. CODE § Ag 166.72, predicated on the issuance of the NOD, "that finding of eligibility did not constitute an actual award of a grant, but merely the maximum amount the [Nehms] would be eligible to receive . . . ." The Department's decision further found that the Nehms were required to enter into a cost-share agreement with the division and, in order to do that, the Nehms were required to identify which

agency (the Department or ASCS) to apply to for grant money. Furthermore, the examiner found that all of the steps which were required in order for SWRM to determine the amount of the cost-share funds to be awarded were communicated to the Nehms on numerous occasions.

The Department's decision also considered the Nehms' argument that they should have been given more time to comply with the cost-share requirements "because of the difficult circumstances under which they labored in making the relocation" and found that the Nehms were given ample time extensions. The hearing examiner, in particular, pointed to the fact that the Nehms were able to complete the actual installation of a manure runoff system for the Green Lake county farm prior to the January 31, 1991 deadline, although all SWRM required was the submission and approval of preliminary plans. Finally, because the Department's rules allow it to determine that a person is not eligible for a cost-share grant because the NOD has terminated, *see* WIS. ADM. CODE § Ag 166.72(4)(f), the hearing examiner found that the decision of the Department to declare the Nehms ineligible was supported by substantial evidence.

Under the highly deferential standard of review to which we are bound in reviewing an agency's decision, we conclude that the Department's determination that the Nehms were no longer eligible for the cost-share grant was supported by substantial evidence in the record and was not inconsistent with the language of the regulation or clearly erroneous. *See Monroe,* 119 Wis. 2d at 390–91, 349 N.W.2d at 749. We nonetheless agree with the circuit court that "it [is] a harsh result to end the process by simply saying the Nehms failed to

122

technically comply" when the Nehms accomplished "what the main purpose of the whole process was."[7]

The Nehms argue that this court should affirm the circuit court decision in which the court conceded that "the administrative process correctly determined that the eligibility of the Nehms was not fulfilled under the deadlines," but then found that this failed to take into account the "unusual or extenuating circumstances" that were part of this case. In considering those circumstances that it concluded were dispositive of the Department's failure to assist the Nehms in complying with the cost-share grant requirements, the court substituted its judgment for that of the Department. Because the Department's determination was based on the imposition of its own rules and because its rules clearly allowed it to declare the Nehms ineligible once the NOD was satisfied, the applicable standard of review did not permit the circuit court to "substitute its judgment for that of the agency as to the weight of the evidence." *See* § 227.57(6), STATS.

The Nehms also argue that the Department had an obligation under a theory of promissory estoppel to

---

[7] While we conclude that substantial evidence in the record supported the decision of the Department, we are troubled by its focus on "wrapping up" the project once the Washington county farm was abandoned and the Nehms had relocated. The Nehms abated the discharge by abandoning the Washington county farm, relocating their farming operation and dairy herd to a farm sixty miles away, and taking steps to assure the compliance of their new operation with environmental standards. Nonetheless, because of the imposition of the deadline and the Nehms' failure to elect whether they wanted to pursue cost-share funding for the manure management project with the Department or ASCS, the Nehms are now ineligible for the cost-share money that was the subject of the variance.

provide them with grant money.[8] A promise which the promisor should reasonably expect to induce action of a definite and substantial character on the part of the promisee, and which does induce such action, is binding if injustice can only be avoided by enforcement of the promise. *See Kramer v. Alpine Valley Resort, Inc.,* 108 Wis. 2d 417, 422, 321 N.W.2d 293, 295–96 (1982). The Nehms contend that "[t]he [Department] promised to provide this grant to [them] as long as [they] satisfied their NOD by relocating their cattle and properly abandon[ed] the Washington county farm." This argument misconstrues the nature of the cost-share grant. The cost-share grant was never promised to the Nehms without "strings attached." It is mandated that a cost-share grant cannot be awarded until the requirements of WIS. ADM. CODE § Ag 166.71 are satisfied. Among other requirements, the "specific best management practices" must be identified. *See* WIS. ADM. CODE § Ag 166.71(1)(b). While the Nehms argue that the requirements of WIS. ADM. CODE § Ag 166.71 were ultimately the responsibility of the Department, there was substantial evidence presented that the Nehms failed to meet even their limited responsibilities under the rules. The promissory estoppel argument is unpersuasive.

---

[8] The Nehms also argue that the offer of the cost-share funds constituted a contractual obligation by the Department. This argument ignores the plain language on the cost-share grant application which states, "I also understand that this determination does not obligate me to participate in the program nor does it obligate the Wisconsin Farmers Fund Program to cost-share with me." Since it is uncontroverted that the Nehms never signed a cost-share agreement, there is no basis upon which to argue that there was an enforceable contract.

The Nehms also maintain that because "[t]he trial court found, as a matter of law, that the deadline imposed . . . was unreasonable," the decision to declare them ineligible for the cost-share grant was no longer an appropriate exercise of discretion. They argue that because § 92.14(6)(e), STATS., 1989–90, requires that the Department "*shall* make grant awards under this section to eligible applicants," the Department's decision to declare the Nehms ineligible was "outside the range of discretion delegated to the agency by law." *See* § 227.57(8), STATS. This is a mischaracterization of the agency's action.

The Nehms suggest that the Department's action was a "decision to deny [them] the grant that induced them to move from Washington County to Green Lake." We do not agree. When the NOD was issued for the Washington county farm, the Nehms were told that cost-share money was available, but that its use was limited to "proper abandonment of the existing site, and installation of structures, facilities or practices necessary to meet water quality objectives at the new site." It was only after the Nehms had concluded that relocation was the preferred course of action and were actively engaged in the relocation process nearly a year later that the Nehms were notified of the variance proposal. This proposal, however, clearly provided:

\* *The money must first be used to correct any identified manure management problems at the new site.*

\* *After the identified problems at the new site are corrected,* any remaining money can be used for any purpose directly related to housing or feeding the livestock and managing the manure generated by the livestock. [Emphasis added.]

The above language plainly states that the cost-share grant did not come without "strings attached." In order to be eligible for the cost-share funds, the state required the Nehms to not only properly abandon the Washington county farm, but also to assure that the problems at that site were not merely replicated when the Nehms acquired the Green Lake county farm. Therefore, it included the requirement that the cost-share money be initially utilized for the correction of any manure management problems at the new site. Counsel's suggestion that the "award" of the money "induced" the Nehms to relocate is not borne out by the facts of the case. The Department was acting within its discretion when it instituted a deadline after the termination of the NOD for the Nehms to state their intentions with regard to the available cost-share funds; the Department's determination that the Nehms were ineligible was also within that agency's discretion.

The Nehms also cross-appeal from the circuit court's denial of attorney's fees and costs. Because of our reversal of the circuit court's determination, the issue of fees and costs is moot. *See City of Racine v. J-T Enters. of Am., Inc.,* 64 Wis. 2d 691, 700, 221 N.W.2d 869, 874 (1974).

*By the Court.*—Order reversed.